IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KRISTIN HISER, | : | Case No. 1:13 CV 1481 |
| Plaintiff, | : | |
| v. | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | MEMORANDUM DECISION AND ORDER |
| Defendant. | : | |

## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636(c) and FED. R. CIV. P. 73, the parties consented to have the undersigned Magistrate Judge conduct all proceedings in this case including ordering the entry of final judgment.  Plaintiff seeks review of Defendant's final determination denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 1381 *et seq*.  Pending are the Briefs of the parties (Docket Nos. 18 and 19). For the reasons that follow, the Magistrate Judge affirms the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

On August 10, 2010, the Social Security Administration (Administration) acknowledged receipt of Plaintiff's application for DIB (Docket No. 11, pp. 197-198 of 683).  Her application was denied initially and upon reconsideration (Docket No. 11, pp. 139-142; 149-151 of 683).  On January 5, 2012, Plaintiff, represented by counsel, Medical Expert (ME) Dr. Herschel Goren, and Vocational Expert (VE) Tracy Young, appeared before Administrative Law Judge (ALJ) Alfred V.

Lucas (Docket No. 11, p. 45 of 683).  On March 8, 2012, the ALJ rendered an unfavorable decision (Docket No. 11, pp. 11-24 of 683).  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on June 14, 2013, thereby rendering the ALJ's decision the final decision of the Commissioner (Docket No. 11, pp. 5-7 of 683).  Plaintiff timely filed a Complaint in this Court on July 9, 2013, seeking judicial review of the Commissioner's decision denying her benefits (Docket No. 1).  Defendant filed an Answer on September 11, 2013 (Docket Nos. 10 & 11).

### III. THE ADMINISTRATIVE HEARING.

#### A. PLAINTIFF'S TESTIMONY.

Plaintiff was 29 years of age, she weighed 150 pounds and was 5'9" tall.  Plaintiff had an associate degree in paralegal studies (Docket No. 11, p. 49 of 683).  Plaintiff's household members included her boyfriend and two minor children (Docket No. 11, pp. 48-49 of 683).  She received public aid and supplemental nutrition assistance (Docket No. 11, p. 68 of 683).  Her boyfriend, a retiree, received Social Security (Docket No. 11, p. 68 of 683).

Plaintiff had been diagnosed and/or treated for recurring herniated disk; hip pain that radiated from her buttocks to her left foot; sinusitis and anxiety.  Plaintiff had run the gamut of medical treatment for chronic and severe back pain, having undergone three surgeries, cortisone injections and physical therapy.  Plaintiff received injections to relieve hip pain but to no avail.  During the day, Plaintiff applied a heating pad to her hip and during the night, she was awakened by hip pain.  Plaintiff had undergone thirteen operations including the removal of nasal polyps, a drug regimen of antibiotics and/or steroids and surgery.  Finally, Plaintiff was undergoing treatment for social anxiety and depression (Docket No. 11, pp. 54; 55; 56; 58; 59; 63-64; 69 of 842).

Plaintiff was treating with an ear, nose and throat (ENT) physician, psychologist and a pain

2

management physician.  The combined effect of her medications--Fentanyl, Valium, Oxycodone,

Ambien--was drowsiness and dizziness.  Fentanyl was delivered via a transdermal system which

Plaintiff suspected precipitated "real bad head rushes" when she sat and stood up.  When changing

the patch, Plaintiff experienced cold sweats, nausea and insomnia.  Although Ambien assisted with

sleeplessness; Plaintiff was convinced that this drug adversely affected her memory and her ability

to concentrate and focus (Docket No. 11, pp. 49; 54-55; 56-57; 64-65 of 683).

Plaintiff completed several terms of employment as a cashier:

- Payroll Advances–typically Plaintiff stood to perform her duties and occasionally she was engaged in heavy lifting.
- Buckeye Check Cashing also known as Checks Mart–Here, Plaintiff supplemented her cashier duties with performance of light janitorial work
- Medic Drug--Plaintiff supplemented her cashier duties by stocking shelves, providing customer service and lifting stock that weighed up to 20 pounds
- BP Products–Plaintiff supplemented her cashier duties with stock work (Docket No. 11, pp. 50; 51; 52 of 683).

Plaintiff had several stints in the dry cleaning/laundry industries:

- DryClean USA--A working production manager who sorted clothing, operated the machines and lifted up to 50 pounds.
- Barry Lee Cleaners--A working supervisor who operated the machines and organized inventory and supplies.
- London Cleaners –For five years preceding July 27, 2010, Plaintiff was a working supervisor, performing her duties while mobile; occasionally lifting boxes of water or chemicals weighing up to fifty pounds.
- Two motels--Plaintiff performed the typical laundry services while standing and regularly lifting up to twenty pounds (Docket No. 11, pp. 49; 50; 52; 53; 54 of 683).

Plaintiff suggests that as a result of her impairments, she had serious functional limitations.

Specifically, she could stand for ten minutes or less; walk for five minutes before experiencing

shooting pain down her leg; sit for approximately fifteen minutes in a commercial chair; ascend and

descend stairs; and touch her knees.  Plaintiff explained that she could not pick up her daughter who

weighed 38 pounds but she could lift a gallon of milk which usually weighs 8.5 to 8.8 pounds

(Docket No. 11, pp. 60; 61; 62 of 683; www.ask.com).

Because of the medication side effects, Plaintiff rarely left the house and she drove sparingly. Rather, Plaintiff fed and dressed herself; watched television and read; worked on puzzles, played board games with her children; and tutored her daughter with her preschool curriculum.  She did not cook, clean, do the laundry, shop without the assistance from her boyfriend or children, participate in any organized activity or visit her family and friends except for holidays (Docket No. 11, pp. 49; 65; 66; 67; 68 of 683).  Occasionally, Plaintiff used a cane to ambulate and she wore a back brace if she was going to endure a long car ride or sit for prolonged periods of time (Docket No. 11, p. 62 of 683).

## B. THE ME'S TESTIMONY.

The ME highlighted components of the medical record that he considered expository:

- April 5, 2008     Results from a magnetic resonance imaging (MRI) showed minimal abnormality.
- April 25, 2008     Results from the electromyogram were mildly abnormal (Docket No. 11, p. 73 of 683).
- August 2008     Diskectomy was performed.
- May 5, 2009     Fusion was performed (Docket No. 11, p. 74 of 683).
- October 9, 2010     The treating physician failed to make clear how a back operation would interfere with an individual's ability to sit or how the back operation would interfere with an individual's ability to push, pull, reach or handle (Docket No. 11, pp. 74-75 of 683).
- January 17, 2011     Plaintiff was hospitalized for complaints of left lower paralysis.  Hoover's sign[1] was present (Docket No. 11, pp. 75-76 of 683).
- July 21, 2011     Narcotic dependence was diagnosed.  Plaintiff's strength and

---

[1]

When a subject lying supine is asked to raise one leg, he or she involuntarily creates counterpressure with the heel of the other leg; if this leg is paralyzed, whatever muscular power is preserved in it will be exerted in this way; or if the patient attempts to lift a paralyzed leg, counterpressure will be made with the other heel, whether any movement occurs in the paralyzed limb or not; not present in hysteria or malingering. STEDMAN'S MEDICAL DICTIONARY (2006).

4

|   |   | gait were normal (Docket No. 11, p. 77 of 683). |
|---|---|---|
| ● | August 31, 2011 | Plaintiff was diagnosed with post laminectomy syndrome which refers to people who have had surgery and say they have pain after surgery (Docket No. 11, pp. 85-86 of 683). |

The ME suggested that comparisons to the Listing could be made accordingly:

| ● | Major Depressive Disorder (MDD) | Listing 12.04. |
|---|---|---|
| ● | Panic Disorder | Listing 12.06. |
| ● | Pain Disorder w/psychological factors and general medical condition. | Listing 12.07. |
| ● | Narcotic Dependence | Listing 12.09. |

Considering the alleged onset day of July 16, 2010, the ME opined that Plaintiff's impairments did not meet or equal the Listings above (Docket No. 11, pp. 77; 78-79 of 683).

The ME cited to the evidence from consultative examiner Dr. Andrea Johnson, a clinical psychologist, that suggests Plaintiff had a pain disorder associated with psychological factors and a general medical condition that would cause Plaintiff to experience greater pain than without a psychiatric impairment (Docket No. 11, pp. 84-85 of 683).  Having no way to quantify pain, the ME admitted that he ignored Plaintiff's complaints of pain in assessing residual functional capacity (RFC).  However, even with pain, Plaintiff's postural restrictions included the ability to lift and carry 20 pounds occasionally and ten pounds frequently; stand, walk and sit.  Plaintiff could never climb using a ladder, rope or scaffold; but she could occasionally climb using a ramp or stairs; stoop, kneel, crouch or crawl (Docket No. 11, pp. 77; 78-79 of 683).  The ME expressed amazement that back surgery would affect the function of Plaintiff's arms or her ability to sit (Docket No. 11, pp. 81; 82 of 683).

With respect to mental restrictions, the ME acknowledged that Dr. Andrea Johnson, a clinical psychologist, determined that there was evidence of a psychiatric impairment that would lead Plaintiff to experiencing greater pain than one without a psychiatric impairment would experience.

5

The ME opined that because of her mental impairments, Plaintiff was restricted to superficial interpersonal interaction with supervisors, co-workers and the general public.  He also recommended that Plaintiff refrain from employment that had high production quotas (Docket No. 11, pp. 78-79; 84-85; 351 of 683).

     C.      THE VE'S TESTIMONY.

Initially the VE summarized Plaintiff's vocational information by exertional level, skill level and the amount of lapsed time required by a typical worker to learn the techniques, acquire the information and develop the facility needed for average performance in a specific job-worker situation or specific vocational preparation (SVP):

| JOB/DOT | EXERTION LEVEL | SKILL LEVEL | SVP |
|---|---|---|---|
| **DRY CLEANER 362.382-014** | **MEDIUM WORK** involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c) (Thomson Reuters 2014). | **Skilled work** requires a person to use judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material that will be produced. 20 C.F.R. § 404.1568(c) (Thomson Reuters 2014). | 5--Over 6 months and up to and including one year. WWW.ONETONLINE.ORG. |
| **CASHIER 211.462-010** | **LIGHT** work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  20 C.F.R. § 404.1567(b)(Thomson Reuters 2014). | **Unskilled work** involves job performances which require little or no judgment to do simple duties that can be learned on the job in a short period of time.  20 C.F.R § 404.1568(a) (Thomson Reuters 2014). | **2--ANYTHING BEYOND A SHORT DEMONSTRATION UP TO AND INCLUDING ONE MONTH.** WWW.ONETONLINE.ORG. |
| **LAUNDRY WORKER 361.685-010** | **MEDIUM WORK** | **UNSKILLED WORK** | **2** |
| **PAINTER 840.381-010** | **MEDIUM WORK** | **SKILLED WORK** | **7--OVER 2 YEARS UP TO AND INCLUDING 4 YEARS.** WWW.ONETONLINE.ORG. |

6

(Docket No. 11, pp. 89; 90 of 683).

The ALJ posed the following hypothetical question to the VE:

Assume a person of the same age, education, work background and impairments to the extent that Plaintiff is described today?

The VE explained that there would be no jobs that exist in significant numbers that this hypothetical person could perform (Docket No. 11, p. 90 of 683).

The ALJ posed a second hypothetical question to the VE:

Assume an individual of the same age, education and work background, and that individual is capable of a certain range of light work except that this individual would not be able to perform work requiring the climbing of ladders, ropes or scaffolds but could occasionally climb using ramps or stairs; the individual could occasionally stoop, kneel, crouch and crawl and would be limited to superficial interpersonal interaction which would exclude jobs requiring arbitration, negotiation, confrontational work, supervision or responsibility for the health and safety of other. This individual would be limited to low stress work not requiring high production quotas such as assembly work or piece work.  Would there be jobs which exist in significant numbers in the economy that this hypothetical person could do?

The VE explained that this hypothetical individual could perform light unskilled work as a housekeeping cleaner.  Such job identified at DOT 323.687-014 had an SVP of 2.  Nationally there are 221,660 of these jobs and in Ohio, approximately 7,464.

The hypothetical individual could also perform work as a merchandise marker.  The DOT number for this job is 209.587-034 and there are jobs in the United States totaling 468,190 and in Ohio, approximately 18, 574.

Finally, this hypothetical individual could perform light, unskilled work as a routing clerk. This job is identified at DOT 222.587-038 and has an SVP of 2.  Nationally, there are approximately 73,855 of these jobs and in Ohio, approximately 2,638 (Docket No. 11, pp. 90-92 of 683).

The ALJ posed a third hypothetical question:

7

Assume an individual of the same age, education and work background, and that person would be limited to light work and restricted against work involving the climbing of ladders, ropes and scaffolds; the individual could occasionally stoop and kneel occasionally; frequently crouching and crawling; this individual should avoid contaminated air such as pollens, fumes, odors, dust, gases and hazards such as moving machinery, unprotected heights, dangerous work products; simple work, low stress in nature, repetitive tasks, and without strict production quotas.  Would there be jobs which exist in significant numbers in the economy that this hypothetical individual could perform?

The VE concluded that this hypothetical individual could perform the three jobs listed above (Docket No. 11, p. 92 of 683).

Counsel posed the following hypothetical question:

Assume an individual limited strictly by these limitations:  lifting five pounds frequently or occasionally, limited to standing and/or walking three out of eight hours a day, and sitting three out of eight hours a day.  Is there work for this individual?

The VE opined that this description was for less than sedentary and full-time work; therefore, no jobs existed which Plaintiff could perform (Docket No. 11, p. 93 of 683).  When asked about the maximum amount of time off task during a workday that an individual can take in addition to maintaining normally scheduled work breaks and still be able to maintain employment, the VE opined that although it was dependent on each employer; in unskilled, entry level work, 20% or more of being off task would not be tolerated (Docket No. 11, p. 94 of 683).

### III.  THE MEDICAL EVIDENCE.

Plaintiff's medical issues became severe in 2008 when she began experiencing constant and severe lower back pain (Docket No. 11, p. 58 of 683).  The MRI administered on January 22, 2008, showed disc herniation centrally at L5-S1 and status post left-sided laminectomy at L5-S1 with enhancing scar tissue along the left side (Docket No. 11, p. 302 of 683).

During March and April 2008, Dr. Sandeep V. Kotak, M. D., an internal medicine specialist,

8

treated Plaintiff for the listed conditions:

- March 7--back pain (Docket No. 11, p. 563 of 683).
- March 18--urinary tract infection, ulcerative colitis; and influenza (Docket No. 11, p. 562 of 683).
- March 31--back pain (Docket No. 11, p. 561 of 683).
- April 5–low back pain extending to buttocks (Docket No. 11, p. 574 of 683).
- April 8--anxiety (Docket No. 11, p. 560 of 683).
- April 25–weakness in both legs.  The MRI evidence suggested "relatively acute mild bilateral L5 radiculopathy and borderline bilateral S1 proximal conduction" (Docket No. 11, pp. 305-307 of 683).

On May 6, 2008, May 13, 2008 and June 10, 2008, Dr. Matthew M. Keum, M.D., a physical medicine and rehabilitation specialist, injected into Plaintiff's epidural space of the spinal column, a medication cocktail used to reduce back pain and inflammation.  On May 16, 2008, May 19, 2008 and May 30, 2008, a physical therapist used electrical stimulation and moist heat to promote pain relief   (Docket No. 11, pp. 286; 287; 288; 289 of 683; www.healthgrades.com/physician/dr-matthew-keum).

Dr. Kotak conducted follow-up care on Plaintiff's complaints of anxiety (Docket No. 11, p. 559 of 683).  On June 11, 2008, he discussed smoking cessation, ongoing back pain and reviewed her medication intake (Docket No. 11, p. 558 of 683).

Plaintiff was given a right lumbar joint block on June 10, 2008 (Docket No. 11, p. 286 of 683).  The MRI administered on June 27, 2008 showed some slight central protrusion into the epidural fat without central canal or neural foraminal compromise and minimal central protrusion of the L5-S1 disc without further pathology (Docket No. 11, p. 308 of 683).

Dr. Susan E. Stephens, M.D., an orthopedic surgeon, conducted a review of systems on August 7, 2008, confirming that Plaintiff had chronic lower back pain, probably the result of a herniated disc at lumbar five through sacral one left.  On August 12, 2008, Dr. Stephens performed a minimally invasive diskectomy on the left at L5/S1.  Based on this surgery, Dr. Stephens released

9

Plaintiff to return to work without restrictions effective October 15, 2008 (Docket No. 11, pp. 273-280; 669; 679-682 of 683; www.healthgrades.com/physician/dr-susan-stephens).

On August 25, 2008, Dr. Kotak reviewed Plaintiff's ongoing complaints of anxiety and back pain.  He continued her medication (Docket No. 11, p. 557 of 683).  Plaintiff presented to Dr. Kotak on September 22, 2008 and September 29, 2008, with a low grade fever, and complaints of fatigue, difficulty sleeping and loss of appetite.  On each occasion, Dr. Kotak provided drug therapy (Docket No. 11, pp. 553-554; 555-556 of 683).

From a sample collected on January 21, 2009, the ratio of Plaintiff's blood urea nitrogen and serum creatinine, a good indicator of kidney function, was considered slightly elevated above the normal range (Docket No. 11, p. 304 of 683).  On January 22, 2009, Plaintiff underwent an MRI of the spinal canal and the results showed disc herniation centrally at L5-S1 and status post laminectomy at L5-S1 with enhancing scar tissue along the left side of the dural sac and adjacent to the S1 nerve root (Docket No. 11, p. 320 of 683).

The X-ray of Plaintiff's spine administered on April 28, 2009, confirmed the presence of mild disc space narrowing at L5-S1 (Docket No. 11, p. 678 of 682).

On May 5, 2009, Plaintiff underwent a laminectomy at L5-S1, a left transforaminal lumbar interbody fusion at L5-S1 and screw fixation bilaterally at L5-S1 (Docket No. 11, pp. 257-272; 682-683 of 683).

On May 18, 2009, Dr. Stephens added Keflex, a medication used to treat bacterial infections to Plaintiff's drug regimen On June 15, 2009, she noted that Plaintiff was "doing great" and set Plaintiff up with physical therapy to include aqua therapy.  On July 15, 2009, she had a candid discussion with Plaintiff regarding narcotic dependence (Docket No. 11, pp. 673; 675 of 683).

An initial screening for pain management was conducted on July 16, 2009, by the OAKTREE

10

CLINIC FOR BACK PAIN AND ARTHRITIS personnel.  Illicit drugs were not detected in Plaintiff's system; however, Fentanyl and Hydrocodone–which were included in her medical profile, were not detected in her blood chemistry (Docket No. 11, pp. 298-301 of 683).

An intra-articular injection was administered bilaterally into the disc space at L5-S1 on October 6, 2009.  The diagnostic imaging of Plaintiff's spine taken on October 12, 2009 and October 17, 2009 showed:

- The vertebral bodies of the lumbar spine were in anatomic alignment.
- The intervertebral cage spacing device was noted in the L5/S1 disc space.
- The posterior stabilization rods were fixed to the L5 and S1 vetebral bodies with screws (Docket No. 11, pp. 285; 296-297; 677 of 683).

On January 12, 2010, January 19, 2010, and January 26, 2010, Dr. Keum administered injections of hypertonic saline solution with Depo-Medrol to relieve Plaintiff's pain (Docket No. 11, pp. 282-284 of 683).

Diagnostic images of Plaintiff's lumbosacral spine taken on Aril 22, 2010, showed a stable appearance when accounting for the laminectomy at L5 and placement of the surgical rods and screws at L5-S1 (Docket No. 11, p. 295 of 683).

Plaintiff consulted with Dr. Raj Sindwani, M.D., an otolaryngologist, regarding chronic rhinosinusitis.  On May 3, 2010, the results from the nasal endoscopy demonstrated bilateral polyposis (Docket No. 11, pp. 578-583 of 2010; www.healthgrades.com/physician/dr-raj-sindwani). On May 24, 2010, results from a sinus computed tomography (CT) study showed extensive disease including chronic rhinosinusitis, sinonasal polyposis, a smell taste disorder and tobacco use disorder (Docket No. 11, pp. 575-578; 584-585; 626 of 683).  On June 28, 2010, Plaintiff underwent nasal debridement, after which she was prescribed oral corticosteroids (Docket No. 11, pp. 586-589 of 683).

11

Plaintiff treated with Dr. Kotak on three occasions in August 2010 and on two occasions in September 2010:

- August 5--Plaintiff complained that her anxiety was worsening. Dr. Kotak altered her medication regimen (Docket No. 11, pp. 550 of 683).
- August 11--Plaintiff stopped taking some of her medication because she felt better. Dr. Kotak continued her other medications (Docket No. 11, p. 549 of 683).
- August 24--Dr. Kotak increased the dosage of Citalopram, an anti-depressant (Docket No. 11, p. 548 of 683; www.webmd.com/drugs).
- September 9--Plaintiff's anxiety was stable with the drug regimen (Docket No. 11, p. 547 of 683).
- September 22--Plaintiff's anxiety was stable (Docket No. 11, p. 546 of 683).

On October 9, 2010, Dr. Keum opined that Plaintiff can:

- Lift and/or carry five pounds frequently and occasionally.
- Stand and/or walk up to three hours and one half hour without interruption. She will require a sit/stand option.
- Sit for three hours and one half hour without interruption.
- Rarely climb, stoop, crouch, push/pull and crawl.
- Occasionally balance, kneel, reach, handle and engage in gross manipulation (Docket No. 11, pp. 310-311 of 683; www.healthgrades.com/physician/dr-matthew-keum).

The MRI administered on October 19, 2010, showed satisfactory postoperative appearance at the L5-S1 level with mild left S1 perineural enhancement (Docket No. 11, p. 312 of 683).

On November 8, 2010, Dr. Nicholas C. Bambakidis, M. D., a neurological surgeon, conducted a physical examination and reviewed Plaintiff's charts, X-rays and medical history. He speculated that Plaintiff had chronic pain syndrome and that she would benefit from the placement of a device implanted into her body that signaled the spinal cord to control chronic pain (Docket No. 11, p. 375 of 683; www.healthgrades.com/physician/dr-nicholas-bambakidis).

On November 8, 2010, Dr. Wilfredo M. Paras, M. D., an internal medicine specialist, conducted a clinical interview. Despite the chronic low back pain and multiple surgeries, Dr. Paras opined that Plaintiff could perform light work and that:

- She could raise her shoulders, elbows, wrists, fingers, hips, knees, feet and toes

12

        against minimal/moderate resistance as well as against gravity.
- Her ROM in her cervical spine, shoulders, elbows, knees, ankles and wrists were within normal limits.
- Her ROM in Plaintiff's dorsolumbar spine and hip was abnormal (Docket No. 11, pp. 339-340; 341-344 of 683; www.healthgrades.com/physician/dr-wilfredo-paras).

On November 22, 2010, Dr. Sindwani conducted an endoscopy to evaluate the extent of Plaintiff's sinus infection.  He prescribed prednisone (Docket No. 11, pp. 598-602 of 683).

On November 23, 2010, Dr. Jonathan Miller, M. D., a neurological surgeon, evaluated Plaintiff and suggested that her pain was neuropathic and radicular; therefore, subject to a successful psychological examination and a successful "trial run" prior to permanent implantation, Plaintiff was a likely candidate for placement of a device implanted into her body that signaled the spinal cord to control chronic pain provided she(Docket No. 11, pp. 402-404 of 683; www.healthgrades.com/physician/dr-jonathan-miller).

Dr. Rick Brunner, Ph.D., a psychologist, wrote on January 4, 2011, that he was supportive of Plaintiff's efforts to obtain disability benefits due to her ongoing chronic pain.  In his opinion, Plaintiff's medical condition significantly impaired her ability to perform basic work activities or return to work (Docket No. 11, p. 664 of 668).

The Bureau of Disability Determination (BDD)[2] referred Plaintiff for a clinical interview and mental status evaluation.  On January 8, 2011, Dr. Andrea Johnson, a clinical psychologist, determined that Plaintiff's ability to relate to others was mildly impaired; her ability to understand, remember and follow instructions was moderately impaired; her ability to maintain attention, concentration, persistence and pace to perform routine tasks was mildly impaired; and her mental ability to withstand stress and pressures associated with the day-to-day work activity was moderately

---

[2]

        BDD is a state agency responsible for developing medical evidence and making the initial determination of whether a claimant is disabled.  Www.ssa.gov/disability/determination/htm.

impaired.

Using the American Psychiatric Association's standard criteria for classifying mental disorders, Dr. Johnson categorized Plaintiff's mental disorder(s) as follows:

| AXIS AND WHAT IT MEASURES: | DR. JOHNSON'S DIAGNOSES: |
|---|---|
| One represents acute symptoms that need treatment | Pain disorder with both a psychological disorder and a medical condition. |
| Two assesses personality disorders and intellectual disabilities. | No diagnoses. |
| Three describes physical problems that may be relevant to diagnosing and treating mental disorders. | Plaintiff reports chronic sinus problems, back problems, beginning in 2008, she had a fused vertebrae. |
| Four psychosocial and environmental factors contributing to the disorder. | Health problems. |
| Global Assessment of Functioning (GAF) assigns a clinical judgment in numerical fashion to the individual's overall functioning level. Impairments in psychological, social and occupational/school functioning are considered. The scale ranges from zero (inadequate information) to 100 (superior functioning). | 65-- Some mild symptoms (ex: depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well; has some meaningful interpersonal relationships. |

(Docket No. 11, pp. 346-351 of 683).

Plaintiff presented to Southwest General Health Center (Southwest) on January 13, 2011, complaining of lumbar pain and residual left foot weakness after she fell. The X-rays were negative for right hip, lower spine and pelvis anomalies and the metallic hardware stabilizing the L5-S1 fusion was stable and intact (Docket No. 11, pp. 390-399; 444-460 of 682).

On January 17, 2011, Plaintiff presented to University Hospitals Case Medical Center complaining of acute onset left leg paresis. The diagnostic tests showed normal liver, gallbladder, pancreas and kidney systems and there was an unremarkable ultrasound of the right upper quadrant. A consultation with a neurosurgeon revealed:

- No disorder of the central or peripheral nervous system.

14

- Plaintiff's left lower extremity weakness improved despite claims that there existed an impairment of sensation in all modalities in the left lower extremity up to the left groin (Docket No. 11, pp. 357-373 of 683).

Dr. Kotak diagnosed and treated Plaintiff for strep sore throat on January 25, 2011 (Docket No. 11, p. 545 of 683).

Plaintiff presented to Southwest on January 27, 2011, complaining of a severe sore throat, difficulty swallowing and difficulty breathing.  Upon examination, Plaintiff was diagnosed with a tonsillar infection with abscess formation; chronic back pain and severe chronic ethmoid sinus disease.  Plaintiff's condition was reviewed by an infectious disease specialist and an ENT physician.  Before a complete examination could be made, Plaintiff signed herself out of the hospital against medical advice (Docket No. 11, p. 380-389; 427-443 of 683).

Suspecting that the sinus polyps had returned, Plaintiff presented to Dr. Sindwani on February 22, 2011.  Corticosteroids were again prescribed (Docket No. 11, pp. 603-608 of 683).

On April 3, 2011, Plaintiff presented to the emergency room with complaints that for the last five days she had sinus pain accompanied by headache with vomiting and a sore throat.  She was continued on her home medications (Docket No. 11, pp. 537-540 of 683).

Plaintiff's strep sore throat returned and on April 25, 2011, Dr. Sindwani instituted steroid therapy (Docket No. 11, pp. 609-613 of 683).

The dosage of the Fentanyl transdermal patch was increased and for two months after that Plaintiff had restless legs at night.  The pain escalated during the two weeks preceding May 3, 2011 and  for the past two months and during the past two weeks, the pain had escalated.  Dr. Kotak referred Plaintiff to a neurologist to change the dosage of the patch again (Docket No. 11, p. 544 of 683).

Although the ultrasound of Plaintiff's gallbladder, liver and pancreas administered on May

15

10, 2011, showed no sonographic evidence of cholelithiasis, during the next three days, Plaintiff developed acute abdominal pain and calculus cholecystitis.  On May 13, 2011, Plaintiff underwent laparoscopic removal of her gallbladder (Docket No. 11, pp. 405-425; 572; 573 of 683).

Complaining of painful urination and abdominal pain, Plaintiff presented to Southwest on May 23, 2011, for treatment.  The CT scan of Plaintiff's abdomen showed possible physiological cystic change in the right ovary; otherwise, there was no acute finding.  The chest X-ray showed a normal heart size and no vascular congestion, lung consolidation, pleural effusion or pneumothorax. Plaintiff was prescribed a pain reliever, calcium, Vitamin D, milk thistle and a multivitamin (Docket No. 11, pp. 478-491; 570 of 683).

BDD referred Plaintiff for a psychological evaluation to assess her mental status and the existence of any psychological condition that would impair her ability to function on a daily basis. Dr. Michael W. Faust, Ph.D., a clinical psychologist, conducted that evaluation on June 8, 2011, and estimated that Plaintiff was functioning within the average range of intelligence but she demonstrated some difficulty with attention and concentration on mental status tasks and this is viewed as secondary to her depression and anxiety.

In the four work-related mental abilities, Plaintiff:

- Had no difficulty understanding questions or instructions, including complex or multi-step instructions and she possessed adequate memory to record her history.
- Had a variable level of attention/concentration and she struggled to stay focused.
- Was depressed and anxious and she presented as having limitations in her ability to respond to others in the work place due to emotional issues.
- Had no effective coping skills that would assist with increased depression, anxiety and panic symptoms if exposed to work pressures.

Using the American Psychiatric Association's standard criteria for classifying mental disorders, Dr. Faust rendered the following analysis:

16

| AXIS AND WHAT IT MEASURES: | DR. FAUST'S DIAGNOSES: |
|---|---|
| One represents acute symptoms that need treatment | MDD, recurrent moderate panic disorder without agoraphobia. |
| Two assesses personality disorders and intellectual disabilities. | No diagnoses. |
| Three describes physical problems that may be relevant to diagnosing and treating mental disorders. | Deferred to medical examination; chronic back pain reported. |
| Four psychosocial and environmental factors contributing to the disorder. | Stressors: financial stress; chronic pain. |
| Global Assessment of Functioning (GAF) assigns a clinical judgment in numerical fashion to the individual's overall functioning level. Impairments in psychological, social and occupational/school functioning are considered.  The scale ranges from zero (inadequate information) to 100 (superior functioning). | 50-- Serious symptoms (ex: suicidal ideation, severe obsessive rituals) OR any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job). |

(Docket No. 11, pp. 462-469 of 683).

Consistent with Plaintiff's request, on June 28, 2011, Dr. Stephens removed four pedicle screws and two rods from the spine.  The metal spine was retained (Docket No. 11, pp. 504-508 of 683).  On July 6, 2011, July 18, 2011 and July 20, 2011, Plaintiff presented for follow-up care. During each visit, Dr. Stephens noted that Plaintiff was doing well and she was ambulating without aids.  On the 18th, Dr. Stephens prescribed Vicodin for pain and on the 20th, Dr. Stephens ordered X-rays to confirm the success of the removal surgery (Docket No. 11, pp. 520-521 of 683).

On or about July 21, 2011, Dr. William D. Padamadan, M. D., performed an internal medicine evaluation, and diagnosed Plaintiff with chronic back pain syndrome with narcotic dependence, history of recurrent sinusitis and surgeries and status post back surgeries.  Based solely on the clinical interview, Dr. Padamadan noted that:

- Plaintiff could sit, stand and walk at least two blocks
- Plaintiff could climb two flights of stairs at an average pace.
- Plaintiff may have difficulty picking up items from the floor.

17

- Plaintiff drove to the appointment in her own car.
- Within six to eight weeks, Plaintiff would be able to perform sedentary light duty activities such as the paralegal activities she trained for.
- Plaintiff's activities of daily living and her instrumental activities of daily living were intact (Docket No. 11, pp. 471-473 of 683).

On August 16, 2011, Plaintiff obtained emergency room treatment for injury to her left foot. The X-rays showed no fracture, dislocation or bone destruction (Docket No. 11, pp. 529-536 of 683). Dr. Padamadan tested Plaintiff's ROM, concluding that Plaintiff could raise her shoulders, elbows, wrists, fingers, hips, knees and feet against maximal resistance; and that her ability to grasp, manipulate, pinch and engage in fine coordination was normal bilaterally. He further considered the ROM in the cervical spine, shoulders, elbows, wrists, hands-fingers, hips, and ankles normal. He considered the ROM in the dorsolumbar spine and knees was limited (Docket No. 11, pp. 474-477 of 683).

Dr. Stephens noted on August 31, 2011, that Plaintiff presented complaining of her "usual pain." She told Plaintiff that she could not help her in terms of continued complaints of pain and that she would see her as circumstances or situations arose (Docket No. 11, pp. 519-520 of 683).

On September 8, 2011, Plaintiff underwent an intra-articular injection (Docket No. 11, pp. 509-510 of 683). The sonographic examination of Plaintiff's liver showed no significant abnormality on September 14, 2011 (Docket No. 11, pp. 641-642 of 683). The X-ray of Plaintiff's chest taken on September 23, 2011, was negative for abnormality (Docket No. 11, p. 513 of 683). The scan of the abdomen administered on September 24, 2011, showed no acute abnormality (Docket No. 11, p. 568 of 683).

Dr. Sindwani performed an endoscopy on October 17, 2011, to determine the extent of the polyp disease. He ordered routine steroid counseling to be followed by radiological tests (Docket No. 11, pp. 614-617 of 683).

On November 1, 2011, Plaintiff presented to Dr. Joseph D. Moses, complaining of epigastric pain. Dr. Moses suspected irritable bowel syndrome for which he recommended a dairy and artificial sweetner-free diet for two weeks. Results from the CT scan of Plaintiff's abdomen were generally unremarkable (Docket No. 11, pp. 644-645; 646-647 of 683).

On November 8, 2011, Plaintiff complained of sleeplessness and Dr. Kotak added Ambien, a sedative used to treat insomnia, to Plaintiff's drug regimen (Docket No. 11, p. 542 of 683). On November 21, 2011, Plaintiff complained of right ear pain and temporary deafness. She was diagnosed with and treated for an ear infection (Docket No. 11, pp. 523-528 of 683).

Dr. Kotak treated Plaintiff for strep throat on December 7, 2011(Docket No. 11, p. 564 of 683).

## IV. THE ALJ'S DECISION.

Having considered the standard of disability, medical evidence and testimony of Plaintiff and the VE, the ALJ made the following findings of fact and conclusions of law on March 8, 2012:

1.     Plaintiff met the insured status requirements of the Act through December 31, 2015. Plaintiff had not engaged in substantial gainful activity since July 16, 2010, the alleged onset date.

2.     Plaintiff had the following severe impairments: (1) lumbar degenerative disc disease; (2) status post diskectomy, laminectomy and subsequent pedicle screw removed; (3) anxiety disorder; and (4) depressive disorder.

3.     Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F. R. art 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.920(d), 404.925, 404.926).

4.     After careful consideration of the entire record, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C. F. R. § 404.1567(b), with restrictions. Specifically, she can lift and carry 20 pounds occasionally and 10 pounds frequently; in an eight-hour workday, she can stand and/or walk for six hours and sit for six hours; she can occasionally climb ramps and stairs; stoop, kneel, crouch and crawl; she cannot work in proximity to unprotected heights, or climb ladders, ropes or scaffolds; she is limited to low stress work with no high production quotas; and she

19

cannot perform work involving more than superficial interaction with others.

5.      Plaintiff was unable to perform any past relevant work.

6.      Considering Plaintiff's age, education, work experience and RFC, there are jobs in the national economy that exists in significant numbers that Plaintiff can perform.

7.      Plaintiff was not under a disability, as defined in the Social Security Act, at any time from July 16, 2010 through the date of the decision on March 8, 2012 (Docket No. 11, pp. 26-39 of 683).

## VI.  STANDARD OF DISABILITY DETERMINATION.

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920 respectively.  DIB and SSI are available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U. S. C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that

20

is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

## VII. THIS COURT'S SCOPE OF REVIEW.

A district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). This Court has jurisdiction over the final ruling of the district court pursuant to 28 U.S.C. § 1291, 42 U.S.C. § 405(g), and 42 U.S.C. § 1383(c)(3).

Congress has provided a limited scope of review for Social Security administrative decisions under 42 U.S.C. § 405(g). The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. *McClanahan v. Commissioner of Social* Security, 474 F.3d 830, 833 (6th Cir. 2006) (*citing* 42 U. S. C. § 405(g)). The court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-627 (6th Cir. 1967)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

21

*Id.* (*citing Besaw v. Secretary of Health and Human Services*, 966 F.2d 1028, 1030 (6th Cir. 1992)).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . .  *Id.*  This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."

*Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

### VIII.  ANALYSIS.

Plaintiff takes issue with the ALJ's failure to analyze her pain disorder with psychological disorder and recognize it as a separate severe impairment.  Plaintiff seeks an order reversing and remanding this case to the Commissioner to consider her impairment at step 2 of the sequential evaluation; to recognize her pain disorder associated with psychological factors in assessing RFC and to consider her pain disorder associated with psychological factors in assessing credibility.

Defendant argues that the ALJ did not deny benefits at step 2.  Rather, he clearly noted and took into consideration Plaintiff's diagnosis of a pain disorder associated with psychological factors and found that Plaintiff's resulting functional limitations did not preclude her from working.

In the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 445, 462 (4th ed.), a pain disorder associated with psychological factors is a recognized mental disorder and a subcategory of somatoform disorders[3].  Somatoform disorders involve physical symptoms suggesting a physical disorder for which there are no demonstrable organic findings or known physiologic mechanisms.  *Id.*  The essential feature of a pain disorder is "pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical

---

[3]

Somatoform disorders are mental illnesses that cause bodily symptoms, including pain.  The symptoms can't be traced back to any physical cause.  And they are not the result of substance abuse or another mental illness. Www.webmd.com/mental-health/somatoform-disorders.

attention."  *Id*. at 458.  Other diagnostic criteria include:  (1) pain causes significant distress or impairment in social, occupation or other important areas of functioning; (2) psychological factors are judged to play a significant role in the onset, severity, exacerbation, or maintenance of the pain; the pain is not intentionally produced or feigned.  *Id*.  Pain disorders may be associated with the inability to work, frequent use of the health care system, the pain becoming a major focus of the individual's life, substantial use of medications, and relational problems and disruption of a normal lifestyle. *Id*.

In the instant case, Plaintiff is in effect arguing that her pain is brought on by psychological problems and that the pain is severe enough to disrupt her day-to-day life.  Even if the Magistrate finds the concept credible, Plaintiff had the burden of proving more than the mere presence of the condition; she was required to show that her physical symptoms could be traced to a mental illness.

The ME acknowledged Dr. Johnson's diagnosis of a pain disorder with psychological components.  He suggested that the people with somatoform disorders generally have normal medical tests that fail to explain the person's symptoms.  However, based on Plaintiff's history and physical examinations, Plaintiff's physical problems did not go beyond the indications of medical evidence.  He was not persuaded that the main symptom of somatoform pain limited Plaintiff's ability to work or perform those activities that she wished to perform.

State agency examiner Dr. Johnson diagnosed Plaintiff with a pain disorder with psychological components.  Dr. Johnson never expressly diagnosed Plaintiff with somatoform disorder.  Neither did she discuss the implications of a somatoform disorder on Plaintiff's functional limitations.  Dr. Johnson was persuaded that Plaintiff's physical pain existed as a result of her medical condition.

Interestingly, there is nothing in the record to trigger analysis under the special technique for

somatoform disorder or consider the pain disorder a severe somatoform disorder at step two of the sequential evaluation.  None of Plaintiff's treating, examining or consultative examiners performed tests to rule out the possible causes of somatoform disorder during the relevant time period.  On the other hand, every treating, examining and consultative source who performed laboratory, clinical and diagnostic tests, was able to identify a clear source of pain unrelated to psychological factors or conflicts.  None of them diagnosed Plaintiff with somatoform pain disorder.

The Magistrate can accurately characterize the record as devoid of evidence establishing a somatoform disorder as a medically determinable impairment.  Consequently, the ALJ did not err by failing to identify Plaintiff's pain disorder with psychological factors as an impairment throughout the sequential evaluation process, including the credibility and RFC findings.

### IX. CONCLUSION.

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:  March 13, 2014